# United States Tax Court

T.C. Memo. 2023-13

WILLARD J. BELTON AND MARTHA-ALEXANDER BELTON,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 22438-19P.                    Filed January 24, 2023.

————

Ps had unpaid tax liabilities for nine taxable years (relevant years). R attempted to collect those liabilities, but had little success.

Ultimately, R certified to the Secretary of State that each P has a "seriously delinquent tax debt" within the meaning of I.R.C. § 7345(b) for the relevant years. Ps filed a joint Petition under I.R.C. § 7345(e)(1) challenging the certifications.

Ps filed a Motion for Summary Judgment urging the Court to find R's I.R.C. § 7345 certifications erroneous because, according to Ps, certain losses from a year after the relevant years should have reduced their tax liabilities below the threshold in I.R.C. § 7345(b)(1)(B). R filed a competing Motion for Summary Judgment arguing that (1) the Court lacks jurisdiction to review the liabilities underlying the I.R.C. § 7345 certifications and (2) the I.R.C. § 7345 certifications should be sustained because they were properly made.

*Held*: We lack jurisdiction to review the liabilities underlying the I.R.C. § 7345 certifications. *See Adams v. Commissioner*, No. 1527-21P, 160 T.C. (Jan. 24, 2023).

**[*2]**      *Held, further*, R has not demonstrated how the portion of the administrative record submitted with his Motion supports the conclusion that the unpaid, legally enforceable tax liabilities for one of the relevant years satisfied the requirements of I.R.C. § 7345(b)(1)(C).

*Held, further*, although R has demonstrated that the portion of the administrative record submitted with his Motion supports the conclusion that the unpaid, legally enforceable tax liabilities for the remaining relevant years satisfied the requirements of I.R.C. § 7345(b)(1)(C) at the time of the certifications, Ps' outstanding liabilities for those remaining years do not meet the minimum threshold set forth in I.R.C. § 7345(b)(1)(B) and (f) to be considered a "seriously delinquent tax debt."

*Held, further*, R is entitled to partial summary judgment with respect to the question of our jurisdiction to review the liabilities underlying an I.R.C. § 7345 certification.

*Held, further*, given the portion of the administrative record submitted with R's Motion and his explanation of that record thus far, R has not yet shown he is entitled to summary judgment that the I.R.C. § 7345 certifications in this case were properly made, and R's Motion on this point will be denied without prejudice to its being renewed.

*Held, further*, Ps are not entitled to summary judgment.

————

Willard J. Belton and Martha-Alexander Belton, pro se.

*Susan K. Bollman*, for respondent.

**[\*3]**                          MEMORANDUM OPINION

TORO, *Judge*: Acting pursuant to section 7345,[1] the Internal Revenue Service (IRS) certified to the Secretary of State that each petitioner, Willard J. Belton and Martha-Alexander Belton, has a "seriously delinquent tax debt" related to unpaid joint federal income tax liabilities for the years 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2014, and 2015 and, in the case of Mr. Belton, his separate income tax liability for 2012 (section 7345 certifications). The Beltons seek our review of those certifications under section 7345(e). They have moved for summary judgment under Rule 121 contending that the section 7345 certifications were improper as a matter of law. The Commissioner has also moved for summary judgment (and supplemented his Motion) maintaining that the section 7345 certifications were proper.

The case presents two important questions. First, we must decide whether we have jurisdiction to consider the Beltons' challenges to the tax liabilities underlying their section 7345 certifications. Second, we must decide what the statute requires the Commissioner to show to be entitled to summary judgment when he relies on levies to prove the existence of a "seriously delinquent tax debt" under section 7345(b). Specifically, we must address whether the requirement of section 7345(b)(1)(C)(ii) that a levy "is made pursuant to section 6331" means that, to prevail on summary judgment, the Commissioner must demonstrate how the record before us shows that he acted in conformity with section 6331 in making the relevant levy.

As we explain below, on the first question, we follow our decision in *Adams v. Commissioner*, No. 1527-21P, 160 T.C. (Jan. 24, 2023), and conclude that we lack jurisdiction to address the Beltons' challenges to their underlying liabilities. On the second question, we conclude that, when the Commissioner relies on levies to prove the existence of a "seriously delinquent tax debt," to prevail on a motion for summary judgment, the Commissioner must demonstrate how the record before us shows that the levies on which he relies were made in conformity with the requirements of section 6331. We further conclude that, in view of the partial administrative record the Commissioner has submitted to us thus far, the Commissioner has failed to make the requisite showing.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (I.R.C. or Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[\*4]** Accordingly, we will grant partial summary judgment to the Commissioner with respect to the question of our jurisdiction to review the Beltons' underlying liabilities, but will deny his Motion, as supplemented, with respect to the question of whether the section 7345 certifications were properly made without prejudice to it being renewed. We will also deny the Beltons' Motion.

## *Background*

The following facts are drawn from the parties' pleadings and Motion papers, including the Exhibits attached thereto. *See* Rule 121(b). The Exhibits included with the Commissioner's Motion include portions (but not all) of the administrative record that formed the basis for the Commissioner's certifications. The facts below are stated solely for the purpose of ruling on the Motions before us and not as findings of fact in this case. *See Whistleblower 769-16W v. Commissioner*, 152 T.C. 172, 173 (2019). The Beltons resided in Louisiana when they filed their Petition.

I.  *The Beltons' Unpaid Tax Liabilities and IRS Collection Efforts*

The Beltons did not pay in full their joint federal income tax liabilities for the years 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2014, and 2015. In addition, Mr. Belton did not pay in full his separate federal income tax liability for 2012. For convenience, we refer to these years collectively as the relevant years.

In an effort to collect the unpaid liabilities, the IRS filed a notice of federal tax lien for each of the taxable years 2004, 2005, 2006, 2007, 2008, 2009, and (with respect to Mr. Belton only) 2012. (As the careful reader will note, for reasons the record does not reveal, the IRS did not file notices of federal tax lien for 2010, 2014, and 2015.) As required by section 6320, the IRS also issued to the Beltons notices of federal tax lien filings informing them of their right to collection due process hearings. The Beltons appear to have requested collection due process hearings in response to certain of these notices, but they either withdrew those requests or waived their rights to judicial review with respect to any determinations made by the IRS Office of Appeals in response to those requests.[2] With respect to the notices for which the Beltons did

---

[2] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019). We will use the name in effect at the times relevant to this case, i.e., the Office of Appeals or Appeals.

[*5] not seek collection due process hearings, it is undisputed that the time for seeking such hearings has lapsed.

In a further effort to collect the Beltons' unpaid tax liabilities, the IRS issued a notice of intent to levy for each of the relevant years, informing the Beltons of their right to a collection due process hearing under section 6330. The Beltons requested collection due process hearings in response to certain of these notices, but either made such requests untimely, withdrew the requests, or waived their rights to judicial review of any notice of determination issued by Appeals. The Commissioner actually levied on the Beltons' right to receive their state income tax refunds in 2010, 2014, and 2015 through an automated levy process known as the State Income Tax Levy Program, as described in Discussion Part II.B.5.b below.[3]

For all the relevant years, the Beltons sought collection alternatives such as installment agreements and offers-in-compromise. We discuss these efforts in greater detail in Discussion Part II.B.5.b.

II.    *Federal Disaster Declaration and Disaster Losses*

Because the Beltons maintain that their unpaid federal income tax liabilities for the relevant years are affected by certain losses they incurred in 2016, we provide some context concerning those losses.

In August 2016, severe storms and flooding affected portions of Louisiana, including Baton Rouge, where the Beltons lived. On August 14, 2016, the President declared that a major disaster existed in the State of Louisiana as a result of the flooding (FEMA Disaster No. 4277). The Beltons claim they incurred losses with respect to certain personal property during the storms. They reported these losses by attaching Form 4684, Casualties and Thefts, to their 2016 Form 1040, U.S. Individual Income Tax Return.

Although the record is unclear as to the exact nature of the damages the Beltons suffered during the storms, they listed "[p]ersonal [p]roperty," "[l]easehold [i]mprovements ([r]eplacement or [r]epair of physical damages)," "[m]achinery [and] [e]quipment," and "[e]conomical

---

[3] The Commissioner may have also levied with respect to the outstanding liabilities for 2004, 2005, 2006, 2007, 2008, 2009, and (with respect to Mr. Belton only) 2012, but, as we discuss below, in light of the notices of federal tax lien issued for those years, consideration of any levies made for those years is unnecessary to our disposition.

**[*6]** [injury] [l]osses" on Form 4684, in Section A, Personal Use Property. The Beltons assert that the disaster losses would have eliminated their outstanding tax liability. For purposes of deciding the Commissioner's Motion, we take their assertion to be true. Therefore, we assume that the Beltons incurred properly deductible disaster losses of an amount sufficient to reduce their unpaid tax liabilities below the threshold set forth in section 7345(b)(1)(B) and (f).

The Beltons appear to have reported the same losses on a Form 1040X, Amended U.S. Individual Income Tax Return, for the taxable year 2016. By filing an amended return, the Beltons may have intended to take advantage of section 165(i)(1), which allows taxpayers to deduct disaster losses for the year immediately preceding a disaster (in this case, 2015).[4] But, if that was their intention, the Beltons checked the wrong box on their Form 1040X. Instead of indicating that the amended return was for the taxable year 2015, they checked the box indicating it was for the taxable year 2016.

The Beltons reported the disaster losses in an unusual way on their returns. For example, they claimed the standard deduction and reported the disaster losses as credits on Line 73 of their 2016 Form 1040 and Line 15 of their 2016 Form 1040X. But disaster losses give rise to deductions, not credits, and should have been reported (among other places) on Line 40 of the 2016 Form 1040 and Line 2 of the 2016 Form 1040X. The computational effect of the positions the Beltons took was to treat the disaster losses as if they reduced the Beltons' tax liability dollar-for-dollar, rather than reducing their taxable income (which would in turn have reduced their tax liability by a much smaller amount). In short, the Beltons filed two returns for the taxable year 2016, both of which reported disaster losses as credits for that year.[5] Faced with the unusual positions in the two filings, the IRS appears to have not applied the disaster losses to the Beltons' account at all.

---

[4] Additionally, section 172(b)(1)(E) (as in effect at that time) allowed taxpayers to carry back disaster losses for the three preceding taxable years (here, 2013–15). Although the Beltons argue that an amendment to section 172 permitted them to carry back disaster losses for the five preceding taxable years, that provision applies only to losses arising in 2018, 2019, or 2020. I.R.C. § 172(b)(1)(D) (added by the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 2303(b), 134 Stat. 281, 353 (2020)).

[5] Between the time they filed their 2016 Form 1040 and their 2016 Form 1040X, the Beltons slightly revised the size of the casualty loss they claimed to have incurred from $85,438 to $86,928.

**[\*7]** III.     *Certification of the Beltons' Tax Debts as Seriously Delinquent*

In December 2019, the Commissioner made two section 7345 certifications with respect to the Beltons' outstanding tax debts. He issued a Notice of Certification of Your Seriously Delinquent Federal Tax Debt to the State Department (Notice of Certification) for each[6] of the Beltons. These Notices of Certification informed the Beltons that the IRS had made section 7345 certifications with respect to their unpaid tax liabilities, that the State Department had been notified of the section 7345 certifications, and that the State Department could revoke their passports or refuse to issue them new passports based on the section 7345 certifications.[7]  *See* 22 U.S.C. § 2714a; 22 C.F.R. § 51.60(h)(2). The Beltons petitioned this Court to review the section 7345 certifications under section 7345(e).

IV.    *Proceedings in Our Court*

The Beltons moved for summary judgment. We construe their submissions liberally given that they are representing themselves. *See* Rule 31(d) ("All pleadings shall be so construed as to do substantial justice."); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)

---

[6] In general, the Beltons are each jointly and severally liable for their unpaid tax liabilities as individuals who are married, filing jointly. *See* I.R.C. § 6013(d)(3). But, for the taxable year 2012, the Beltons filed their federal income tax returns separately. Based on these separate returns, the IRS assessed Mr. Belton an amount for which Ms. Belton was not liable. The sum of Mr. Belton's total unpaid tax liabilities is not the same as the sum of Ms. Belton's total unpaid tax liabilities, and the Commissioner issued two separate section 7345 certifications.

[7] On October 7, 2019, the Commissioner also notified the Beltons of the IRS's intent to levy upon their Social Security benefits to satisfy their unpaid tax liabilities pursuant to section 6331(h). The Beltons attached this notice to their Petition and make certain challenges as to its propriety in their Motion for Summary Judgment. Although in their Petition the Beltons checked the box indicating that they are seeking review of a notice of determination concerning collection action, they did not attach such a notice, and the Commissioner asserts that no such notices have been issued to the Beltons for any of the relevant years.

On November 19, 2021, the Commissioner moved to dismiss for lack of jurisdiction the Beltons' claims regarding the proposed levy on their Social Security benefits. We agree with the Commissioner that we lack jurisdiction to consider the challenged action because no notice of determination concerning collection actions under section 6330 has been issued to the Beltons. I.R.C. § 6330(d); Rule 330(b); *see also Orum v. Commissioner*, 123 T.C. 1, 7–12 (2004), *aff'd*, 412 F.3d 819 (7th Cir. 2005). We will therefore dismiss this portion of the Beltons' case as the Commissioner requests.

**[\*8]** (explaining that documents filed by pro se litigants are "to be liberally construed" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))); *see also Gray v. Commissioner*, 138 T.C. 295, 298 (2012) ("All claims in a petition should be broadly construed so as to do substantial justice, and a petition filed by a pro se litigant should be liberally construed."), *supplemented by* 140 T.C. 163 (2013). Using these principles of construction for pro se litigants, we understand the Beltons to argue that, if the IRS had taken into account in 2015 the disaster losses they claimed in their 2016 Form 1040X, their unpaid federal income tax liabilities for the relevant years would have been below the $52,000 threshold required for the Commissioner to certify those liabilities as seriously delinquent tax debt under section 7345. Thus, on the Beltons' view, if the Court were to consider the underlying liabilities at issue, they would prevail.[8]

The Commissioner responded to the Beltons' Motion. Relying on our decision in *Ruesch v. Commissioner*, 154 T.C. 289 (2020), *aff'd in part, vacated and remanded in part*, 25 F.4th 67 (2d Cir. 2022), he maintains that we lack jurisdiction to review the underlying liabilities that gave rise to the section 7345 certifications.

The Commissioner also filed his own Motion for Summary Judgment. The Motion argues that the Beltons "each have a seriously delinquent debt as defined by section 7345." Resp't's Mot. for Summ. J. 5. The Motion also maintains that "[t]he attached [literal] account transcripts show all assessments and abatements of tax, penalties, and interest; all payments credited; [and] any notices of lien and levy issued pursuant to I.R.C. §§ 6320 and 6330." *Id.* at ¶ 8.

Following a conference call between the parties and the Court to discuss the pending Motions, the Court invited the parties to express their

---

[8] The Beltons also sought civil damages under section 7432 based on an alleged failure by the IRS to release a lien under section 6325. The Commissioner resisted the request, noting that "the Tax Court has no jurisdiction to order such damages under section 7432, which authorizes a taxpayer to 'bring a civil action for damages against the United States in a district court of the United States.'" Resp. to Pet'rs' Mot. for Summ. J. ¶ 5 (quoting I.R.C. § 7432(a)). The Commissioner is correct on this score, meaning that we have no authority to provide the relief the Beltons seek under section 7432 and therefore cannot grant summary judgment in their favor on this point.

**[\*9]** views on whether the requirements of I.R.C. § 7345(b)(1)(C) have been satisfied in this case, especially with respect to any "levy . . . made pursuant to section 6331." I.R.C. § 7345(b)(1)(C)(ii). Specifically, the Court wishes to have the parties' views on how compliance with § 7345(b)(1)(C) is demonstrated by the record before the Court.

In response to this invitation, the Commissioner supplemented his Motion, and the Beltons filed a Response reiterating the view that the section 7345 certifications were improper.

*Discussion*

I.     *Background Law*

    A.     *Summary Judgment*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988).

Generally, in cases in which the Court's review is not confined to the administrative record, the Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). In such cases, the moving party bears the burden of proving that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Espinoza v. Commissioner*, 78 T.C. 412, 416 (1982). And, in deciding whether to grant summary judgment in such cases, we construe factual materials and inferences drawn from them in the light most favorable to the adverse party. *Sundstrand Corp.*, 98 T.C. at 520.

But, as we recognized in *Van Bemmelen v. Commissioner*, 155 T.C. 64, 78 (2020), in cases in which the Court "must confine [itself] to the administrative record to decide whether there has been an abuse of discretion," the ordinary "summary judgment standard is not generally apt." In those cases, "summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 79.

Our Court has not yet decided the scope of review and the standard of review for cases arising under section 7345. As we observed

**[\*10]** in *Rowen v. Commissioner*, 156 T.C. 101, 106 (2021), "we need not do so . . . . [when] there is no dispute between the parties with respect to the evidence we should consider . . . [, and when] our decision would be the same whether we reviewed the Commissioner's certification de novo or for abuse of discretion." The circumstances before us here are similar to those in *Rowen*. As we describe below, the parties have no dispute about the record. And, on the record the parties have placed before us thus far, our decision would be the same whether we followed the ordinary summary judgment standard or the modified *Van Bemmelen* standard. Therefore, we once again have no occasion to decide the scope of review and the standard of review for cases in which the merits of the Commissioner's certification pursuant to section 7345 are at issue.

For convenience, however, and following the parties' lead, in the discussion that follows we use the terminology of the ordinary summary judgment standard.

B.    *Certifications of Seriously Delinquent Tax Debts*

If the Commissioner certifies that a taxpayer has "a seriously delinquent tax debt," section 7345(a) provides that the certification shall be transmitted "to the Secretary of State for action with respect to denial, revocation, or limitation of [the taxpayer's] passport."[9]    The Commissioner is responsible for notifying the taxpayer of the certification.  I.R.C. § 7345(d).

1.    *Definition of "Seriously Delinquent Tax Debt"*

The term "seriously delinquent tax debt" is defined in section 7345(b).  It generally means

> an unpaid, legally enforceable Federal tax liability of an individual—
>
> (A) which has been assessed,
>
> (B) which is greater than $50,000, and

---

[9] Section 7345 outlines a two-step procedure whereby the Commissioner sends certification to the Secretary of the Treasury, who then transmits the certification to the Secretary of State.  In practice, the IRS follows a one-step procedure whereby the Commissioner, as the Secretary's delegate, transmits the certification directly to the State Department.  *See* I.R.C. § 7701(a)(11); Internal Revenue Manual (IRM) 5.1.12.27.1, .6, .8 (Dec. 20, 2017).

**[\*11]**     (C) with respect to which—

(i) a notice of lien has been filed pursuant to section 6323 and the administrative rights under section 6320 with respect to such filing have been exhausted or have lapsed, or

(ii) a levy is made pursuant to section 6331.

I.R.C. § 7345(b)(1).  The threshold amount described in subparagraph (B) is modified by subsection (f) to account for inflation.  The threshold amount relevant here (i.e., the amount for the year when the section 7345 certifications were made) was $52,000.  Rev. Proc. 2018-57, § 3.59, 2018-49 I.R.B. 827, 838.

The statute provides exceptions from this definition.  For instance, a seriously delinquent tax debt does not include "a debt with respect to which collection is suspended . . . because a due process hearing under section 6330 is requested or pending" or because relief from joint and several liability is sought pursuant to subsection (b), (c), or (f) of section 6015.  I.R.C. § 7345(b)(2)(B).  Additionally, no "debt that is being paid in a timely manner pursuant to an [installment] agreement . . . under section 6159 or [a compromise agreement under section] 7122" is a seriously delinquent tax debt.  I.R.C. § 7345(b)(2)(A).

If a certification is found to be erroneous or if the certified debt is fully satisfied or ceases to be seriously delinquent because of one of the exceptions, then the IRS must reverse its certification and notify the Secretary of State and the taxpayer.  I.R.C. § 7345(c)(1), (d).  "In the case of a certification found to be erroneous, such notification shall be made as soon as practicable after such finding."  I.R.C. § 7345(c)(2)(D).

2.     *Our Role in Reviewing Section 7345 Certifications*

Section 7345(e)(1) permits a taxpayer who has been certified as having a seriously delinquent tax debt to petition this Court to determine "whether the certification was erroneous or whether the [IRS] has failed to reverse the certification."  Our jurisdiction in reviewing certifications of seriously delinquent tax debts is set forth in section 7345(e)(1).  If we find that a certification was erroneous, we "may order the Secretary [of the Treasury] to notify the Secretary of State that such certification was erroneous."  I.R.C. § 7345(e)(2).  The statute specifies no other form of relief that we may grant.  *Adams*, No. 1527-21P, 160 T.C., slip op. at 8 (citing *Ruesch v. Commissioner*, 25 F.4th at 70).

[*12] II.    *Application to the Beltons' Case*

    A.    *The Beltons' Challenge to Their Underlying Liabilities*

The Beltons assert that, at the time of the section 7345 certifications, they had incurred losses sufficient to reduce their outstanding federal income tax liabilities for the relevant years below the relevant threshold. *See* I.R.C. § 7345(b)(1)(B), (f). Thus, in their view, they did not owe "a seriously delinquent tax debt," and their section 7345 certifications were erroneous. The Commissioner urges that the statute does not authorize us to consider the arguments the Beltons advance and seeks summary judgment on this point.[10]

In view of the Commissioner's Motion for Summary Judgment, we assume that, as a factual matter, the Beltons would be able to demonstrate on the record that was before the Commissioner at the time of the section 7345 certifications or at least on a properly supplemented

---

[10] On June 7, 2021, the Commissioner filed a separate Motion addressing two other points. First, the Commissioner moved the Court to dismiss the Beltons' case insofar as it relates to purported notices of determination for the relevant years and the taxable year 2016. The Commissioner argues that no notices of determination for the relevant years or 2016 were attached to the Petition and, based on a diligent search of his records, there is no record of any such notice having been issued. The Beltons offer no response on this point. Based on the foregoing, we will grant the Commissioner's Motion and dismiss the case in so far as it relates to notices of determination issued with respect to the relevant years and the taxable year 2016. *See* I.R.C. § 6330(d); Rule 330(b); *see also Atl. Pac. Mgmt. Grp., LLC v. Commissioner*, 152 T.C. 330, 335 (2019) ("Absent a determination letter [the taxpayer] lacks the 'jurisdictional hook' to enter this Court." (citing *Adolphson v. Commissioner*, 842 F.3d 478, 485 (7th Cir. 2016))); *Orum*, 123 T.C. at 7–12.

Second, the Commissioner also moved the Court to strike the Petition's references to the taxable year 2016 because that year is not one of the taxable years upon which the Commissioner based his section 7345 certifications and because no other provision of the Code grants the Court jurisdiction to redetermine the Beltons' underlying tax liability for that year. But we generally can draw factual inferences based on taxable years not at issue when they directly bear on the underlying tax liability for a taxable year properly at issue. *See, e.g., Ron Lykins, Inc. v. Commissioner*, 133 T.C. 87, 103–06 (2009) (concluding that a net operating loss carryback could have been litigated in a case challenging the deficiency determined for the carryback year); *Keith v. Commissioner*, 115 T.C. 605, 621 (2000) ("We have jurisdiction to consider . . . facts related to years not in issue as may be necessary for redetermination of tax liability for the period before the Court."). Here, the taxable years at issue are the years upon which the section 7345 certifications are based. The Beltons' tax liabilities for those years could well be affected by the carryback of a disaster loss that occurred during the taxable year 2016. Accordingly, we will deny the Commissioner's Motion To Strike.

[*13] record that they had sufficiently large losses to reduce their outstanding federal income tax liabilities below the relevant threshold. *See Sundstrand Corp.*, 98 T.C. at 520. We must therefore confront a threshold issue: does section 7345 authorize us to look behind the outstanding liabilities as of the time of the certification and consider issues that affect the determination of those liabilities?

As the Commissioner points out, this Court previously answered the question in the Commissioner's favor in *Ruesch*, holding that we do not have jurisdiction to redetermine the tax liabilities underlying a section 7345 certification. On appeal, the U.S. Court of Appeals for the Second Circuit vacated for mootness the portion of our order in *Ruesch* resolving the jurisdictional question. *See Ruesch v. Commissioner*, 25 F.4th at 71–72.[11]

In *Adams*, a division opinion filed today, we observed that, "although our opinion in *Ruesch* was deprived of its precedential effect [because of the Second Circuit's vacatur, that opinion] has not lost its persuasive value," and we saw "no reason to depart from it." *Adams*, 160 T.C., slip op. at 12. We went on to "readopt our holding in *Ruesch*, concluding that we do not have jurisdiction to review the liabilities underlying the certification of a seriously delinquent tax debt." *Id.* at 12–13 (citing *Ruesch*, 154 T.C. at 295–98).

As applied to this case, our conclusion in *Adams* means that we cannot redetermine the tax liabilities underlying the Beltons' section 7345 certifications. We therefore decline to address the merits of their arguments concerning the losses claimed to have been incurred in 2016.

B.     *Whether the Section 7345 Certifications Were Erroneous*

Having determined that we do not have jurisdiction to consider the Beltons' challenges to their underlying liabilities, we turn now to our proper role as described by section 7345(e)(1)—i.e., to "determine whether the certification was erroneous." An action is "erroneous" if it

---

[11] The Second Circuit vacated in part the *Ruesch* order because, at the time we issued the order (and the opinion setting out our reasoning in support of the order), the taxpayer had already received (from the IRS) the only relief she could under section 7345: the reversal of her section 7345 certification. The Second Circuit concluded that the question of mootness is an antecedent question to the question of jurisdiction. *Ruesch v. Commissioner*, 25 F.4th at 71–72. Here, by contrast, the Beltons' section 7345 certifications are still in effect, and whether we have jurisdiction to redetermine their underlying liabilities remains a live controversy.

**[\*14]** is "inconsistent with the law or the facts." *Rowen*, 156 T.C. at 117 (quoting *Erroneous*, *Black's Law Dictionary* (10th ed. 2014)). We will therefore consider whether the Commissioner has shown (based on the materials currently before us) that the requirements of the statute were satisfied at the time of the Beltons' section 7345 certifications.

The definition of "seriously delinquent tax debt" provides a statutory framework with which the Commissioner must comply when making a section 7345 certification. We will analyze each element of the definition in turn. Before turning to that analysis, however, we pause briefly to explain how the IRS tracks some of the information that is necessary to our analysis.

### 1.    *IRS Computer Systems and Transcripts of Account*

The IRS maintains in its computer systems a great deal of information regarding each taxpayer's federal tax obligations. The IRS uses a computer interface called the Integrated Data Retrieval System (IDRS) to retrieve data from those systems.[12] Upon request from an authorized person, the IRS can generate transcripts of account to show some of the information stored in its computer systems. *See generally* IRM 21.2.3 (Sept. 6, 2022).

One kind of transcript is a "literal account transcript." That transcript shows basic taxpayer data for a particular taxable year for a particular type of tax. For example, a transcript for the taxpayer's income tax for a given year shows whether a return was filed, the filing status, adjusted gross income, and so on. The transcript also shows IRS activity for that year by displaying transaction codes accompanied by descriptors called "explanation[s] of transaction." For example, the codes may show that the IRS began an examination, engaged in certain collection activity, and the like. The explanations distinguish "literal" account transcripts from other types of transcripts, which contain various transaction codes but not explanations.[13]

Another kind of transcript is the "TXMODA transcript." A TXMODA transcript, like a literal account transcript, contains current

---

[12] IDRS is essentially the interface between the IRS's employees and various computer systems. *Kaeckell v. Commissioner*, T.C. Memo. 2002-114, 2002 Tax Ct. Memo LEXIS 119, at *5 n.2.

[13] A literal transcript is a transcript in "plain English" with a minimum of "computerese." *Keene v. Commissioner*, T.C. Memo. 2002-277, 2002 Tax Ct. Memo LEXIS 286, at *12 n.7.

[*15] account information obtained from the IRS's computer systems, but presented differently.[14] TXMODA transcripts omit the descriptors and instead provide individual "action codes" for each transaction code. TXMODA transcript action codes can be more specific than a literal account transcript's descriptors because the specific actions they represent are often explained in greater detail in the IRM. Put in plain English, people might find it easier to understand literal account transcripts, but have access to more information in a TXMODA transcript.

With that brief detour out of the way, we turn back to definition of "seriously delinquent tax debt."

2. *Section 7345(b)(1)—Unpaid, Legally Enforceable Federal Tax Liability*

The introductory text of section 7345(b)(1) provides that the term "seriously delinquent tax debt" means "an unpaid, legally enforceable Federal tax liability of an individual" that meets certain requirements (discussed further below). There is no dispute that, as of the time of the section 7345 certifications, each of the Beltons had an unpaid, legally enforceable federal tax liability (putting to the side the Beltons' challenge to the underlying liability that we addressed above). Thus, the introductory text of section 7345(b)(1) was satisfied at the time of the certification.

3. *Section 7345(b)(1)(A)—Assessment*

Section 7345(b)(1)(A) provides that the tax liability underlying a section 7345 certification must have been assessed. Section 6201(a)(1) directs the Secretary of the Treasury to "assess all taxes determined by the taxpayer or by the Secretary as to which returns or lists . . . are made." An assessment is made when the IRS makes an entry in its books that the taxpayer owes tax. I.R.C. § 6203; *Hibbs v. Winn*, 542 U.S. 88, 100 (2004); *Baltic v. Commissioner*, 129 T.C. 178, 183 (2007).

The Commissioner provided literal account transcripts for the relevant years to demonstrate that the IRS had assessed the amounts shown on the Beltons' Notices of Certification as seriously delinquent

---

[14] "TXMODA" is the command code that is entered into IDRS to obtain the transcript. *Kaeckell*, 2002 Tax Ct. Memo LEXIS 119, at *5 n.2.

**[\*16]** tax debt before the date of certification.[15]  The Beltons do not contend otherwise.  Therefore, the assessment requirement of subparagraph (A) was met at the time of the section 7345 certifications.

### 4.      *Section 7345(b)(1)(B)—Threshold Amount*

Section 7345(b)(1)(B) provides that the tax debt underlying a section 7345 certification must exceed $50,000.  Under section 7345(f), at the time the Beltons' section 7345 certifications were made, this amount had increased to $52,000 to account for inflation.  Rev. Proc. 2018-57, § 3.59.

Including interest and penalties that had been assessed, when the Commissioner made the two section 7345 certifications, Mr. Belton owed at least $66,779 in assessed, unpaid federal tax liabilities and Ms. Belton owed at least $64,556 in assessed, unpaid federal tax liabilities.[16] Therefore, the threshold amount requirement of subparagraph (B) was met at the time of certification (assuming the remaining requirements of section 7345(b)(1) are met for each year).[17]

---

[15] On the Beltons' literal account transcripts for the relevant years, transaction code "150" followed by the descriptor "Tax return filed" or "Amended return filed" shows an assessment of tax.  Additional transaction codes on their literal account transcripts for the relevant years, such as code "300" accompanied by the descriptor "Additional tax assessed by examination," code "196" accompanied by the descriptor "Interest charged for late payment," or code "276" accompanied by the descriptor "Penalty for late payment of tax," each followed by a dollar amount, show other times when the Commissioner assessed tax.  *See Roberts v. Commissioner*, 118 T.C. 365, 371 n.10 (2002) (recognizing that an Appeals officer's reliance on account transcripts to verify assessment was not an abuse of discretion), *aff'd per curiam*, 329 F.3d 1224 (11th Cir. 2003).

[16] In general, interest continues to run on a tax debt until it is paid.  I.R.C. § 6601.

[17] The Beltons' literal account transcripts reflect that the Beltons made certain small payments on their debt after the date of the section 7345 certifications. Additionally, the amounts they owed for 2006 and 2007 were written off after the certifications because of the expiration of the limitations period.  The literal account transcript for each year contains two entries that read "Passport certified seriously delinquent tax debt reversal."  The Commissioner explains that "petitioners have no liabilities remaining for tax years 2006 and 2007, and their certifications for those years have been systemically reversed."  Resp't's Mot. for Summ. J. 6 n.4.

As a result of these events, the total amount of one or both of the Beltons' seriously delinquent tax debts may have dropped below the threshold in section 7345(b)(1)(B) *after* the date of the certifications.  But this does not suggest that the certifications were erroneous or that they should have been reversed.  Once a valid

**[\*17]**     5.     *Section 7345(b)(1)(C)—Procedural Requirements*

In our section 7345 jurisprudence, we have not yet had occasion to address in detail the specific requirements of subparagraph (C) of section 7345(b)(1).  Subparagraph (C) provides two different paths for the Commissioner to meet the remaining definitional requirements of section 7345(b)(1).

Specifically, the Commissioner must demonstrate that, with respect to the liabilities underlying the section 7345 certification, *either* "(i) a notice of lien has been filed pursuant to section 6323 and the administrative rights under section 6320 with respect to such filing have been exhausted or have lapsed, *or* (ii) a levy is made pursuant to section 6331."  I.R.C. § 7345(b)(1)(C) (emphasis added).  Either of these paths, alone, is sufficient to meet the procedural requirements of subparagraph (C) for a particular year at issue.

The text of clause (i) plainly states that a notice of lien must have been filed and that the taxpayer's administrative rights with respect to the notice of lien filing must have lapsed or been exhausted.  But the reference to section 6323 evinces additional requirements.  Not only must a notice of lien have been filed, but the notice must have been filed "pursuant to section 6323."  I.R.C. § 7345(b)(1)(C)(i); *see also* I.R.C. § 6323(f).[18]  Similarly, clause (ii) provides that levy must have been "made pursuant to section 6331."  I.R.C. § 7345(b)(1)(C)(ii). We therefore must determine what Congress meant by the words "pursuant to" and what they demand of the Commissioner when making a section 7345 certification.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) ("As in all statutory construction cases, we begin with the language of the statute.").

When the words of a statute are plain, they should be accorded their usual significance.  *See Old Colony Tr. Co. v. Commissioner*, 301 U.S. 379, 383 (1937); *see also Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362, 2364 (2019).  When an action is taken "pursuant

---

certification is made, section 7345(c)(1) and (2) provides that a debt ceases to be a seriously delinquent debt only if (as relevant here) the debt "has been *fully* satisfied or has become legally unenforceable."  (Emphasis added.)  Since at least some of the Beltons' debt remains outstanding and legally enforceable, this requirement has not been satisfied.

[18] In general, section 6323(f) provides rules for the proper filing of a federal tax lien.  I.R.C. § 6323(a) (providing that such a lien "shall not be valid . . . until notice thereof which meets the requirements of subsection (f) has been filed").

**[\*18]** to" the terms of, in this case, a statute, that action is "done in consequence or in prosecution" of the statute; the action is "agreeable" to the statute and in "conform[ance]" and "accord[]" with it; the actor "follow[ed]" its terms. *See Old Colony Tr. Co. v. Commissioner*, 301 U.S. at 383 (quoting *Pursuant to, Webster's New International Dictionary, Unabridged* (2d ed. 1935)) (answering the question of whether a trustee acted "pursuant to" the terms of a trust agreement); *see also Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1215 (3d Cir. 1992) (relying on the definition of the phrase "pursuant to" set forth in *Old Colony* in applying another statute using that phrase).

As in *Old Colony*, we take the phrase "pursuant to" as used in clauses (i) and (ii) to mean that, to make a section 7345 certification properly, the Commissioner must have acted in accordance with the terms of sections 6323 and 6331, respectively. *Cf. Brownstone v. United States*, 465 F.3d 525, 531 (2d Cir. 2006) (observing that actions taken "in violation of" a provision are not "pursuant to" that provision (citing *Old Colony Tr. Co. v. Commissioner*, 301 U.S. at 383–84)).[19] Put another way, the Commissioner may not properly make a section 7345 certification if, in attempting to meet either the lien or levy requirements of subparagraph (C), he contravened the terms of either section 6323 or section 6331, as applicable. And, if he did so anyway, such a certification would have been erroneous. *See Rowen*, 156 T.C. at 111 ("[A]n action is 'erroneous' if it is '[i]ncorrect' or 'inconsistent with the law or the facts.'" (quoting *Erroneous, Black's Law Dictionary* (10th ed. 2014))).

Having considered the text of the statute and our role in reviewing whether the Commissioner met the specific requirements of

---

[19] *Cf. McNeil v. United States*, No. CV 20-329, 2021 WL 1061221, at \*5 (D.D.C. Mar. 18, 2021) ("Section 7345 defines 'seriously delinquent tax debt' as 'an unpaid, legally enforceable Federal tax liability of an individual' that has been 'assessed,' is 'greater than $50,000' and is subject to a notice of lien or a levy. 26 U.S.C. § 7345(b)(1). The provision's focus on these characteristics—nonpayment, enforceability, assessment, an amount over $50,000, and the *appropriate* lien or levy—suggests that they are the proper focus of the Court's determination under § 7345(e)." (Emphasis added.)), *aff'd per curiam sub nom. McNeil v. Dep't of State*, No. 21-5161, 2022 WL 4349598 (D.C. Cir. Sept. 20, 2022); *McNeil*, 2022 WL 4349598, at \*1 ("Assuming the truth of appellant's allegations, they fail to support a plausible claim that he does not have an unpaid, legally enforceable Federal tax liability above the statutory threshold amount, or *that the other elements of a seriously delinquent tax debt under 26 U.S.C. § 7345(b)(1) are not met.*" (Emphasis added.)).

**[\*19]** subparagraph (C) of section 7345(b)(1) in making a section 7345 certification, we turn next to whether he did so in the Beltons' case.

a. *Clause (i)—Notice of Federal Tax Lien and Exhaustion or Lapse of Administrative Rights*

For the taxable years 2004, 2005, 2006, 2007, 2008, 2009, and 2012, the Commissioner provided literal account transcripts to show that the IRS filed notices of federal tax liens for those years in accordance with section 6323.[20] Nothing in the transcripts suggests any defect with respect to the notices, nor do the Beltons allege that there were any defects. The transcripts also show that the Beltons' administrative rights under section 6320 have been exhausted or have lapsed. This is sufficient to establish that the Commissioner satisfied the requirements of section 7345(b)(1)(C)(i) for 2004, 2005, 2006, 2007, 2008, 2009, and 2012. *See generally United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

The amounts of the unpaid tax liabilities outstanding for Mr. and Ms. Belton just for the years for which the IRS filed a notice of federal tax lien—$42,898 and $40,675, respectively—are insufficient (by themselves) to justify the Commissioner's certifications of the Beltons' tax debts as seriously delinquent. Therefore, for one or more of the taxable years underlying his section 7345 certifications for which the Commissioner did not meet the conditions of clause (i) (relating to the liens), the Commissioner must show that he met the conditions of clause (ii) (relating to levies).

b. *Clause (ii)—Levy Made*

The Commissioner alleges in his Motion (as supplemented) that, as of the time of the section 7345 certifications, he had made levies

---

[20] For example, the descriptor accompanying transaction code "582" on the Beltons' literal account transcripts states "Lien placed on assets due to balance owed," which means that the IRS filed a Notice of Federal Tax Lien. Transaction code "971" is a miscellaneous code that is used with various explanations of transactions. As relevant to the liens here, the various descriptors on the Beltons' transcripts state: "Issued notice of lien filing and right to Collection Due Process hearing," "Collection due process request received timely," and "Collection due process (hearing) resolved by Appeals—Notice of Determination letter issued, you waived judicial review or withdrew the hearing request."

**[\*20]** pursuant to section 6331 with respect to the Beltons' unpaid tax liabilities for the relevant years. If the Commissioner can demonstrate how this was done based on the record he has placed before us, he will have satisfied the conditions of clause (ii) of subparagraph (C), and the procedural requirements of subparagraph (C) of section 7345(b)(1) will have been met. As we now explain, we conclude that his Motion shows such satisfaction as to 2010 and 2014, but not as to 2015.

i. *Requirements of Clause (ii)*

Nested within clause (ii) are two specific requirements: first, that levy *actually* was made (that is, the issuance to the taxpayer of a notice *of intent to levy* would not suffice for this purpose), and, second, that the levy was made *properly*.

As to the actual making of a levy, section 7701(a)(21) provides that "[t]he term 'levy' includes the power of distraint and seizure by any means," but the term "levy" is not otherwise defined in the Code. The Treasury Regulations offer an indication of how a levy is made: "Levy may be made by serving a notice of levy on any person in possession of, or obligated with respect to, property or rights to property subject to levy, including receivables, bank accounts, evidences of debt, securities, and salaries, wages, commissions, or other compensation." Treas. Reg. § 301.6331-1(a)(1). The regulations explain that such notice may be served by mail. *Id.* para. (c) ("A notice of levy may be served by mailing the notice to the person upon whom the service of a notice of levy is authorized . . . . In such a case the date and time the notice is delivered to the person to be served is [generally] the date and time the levy is made."). The Supreme Court has elaborated on this definition, stating:

> Levy upon tangible property normally is effected by service of forms of levy or notice of levy and physical seizure of the property. Where that is not feasible, the property is posted or tagged. Because intangible property is not susceptible of physical seizure, posting, or tagging, levy upon it is effected by serving the appropriate form upon the party holding the property . . . .

*G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350 (1977) (first citing Treas. Reg. § 301.6331-1(a)(1); and then citing *Phelps v. United States*, 421 U.S. 330, 335–37 (1975)).

As to the proper making of a levy (i.e., for a levy to be "pursuant to section 6331"), it must not contravene the terms of that section. This

21

**[\*21]** includes any of the section 6331 rules that protect taxpayers against a levy action.  *See, e.g.*, I.R.C. § 6331(k).

ii.      *The Commissioner's Position*

The Commissioner's June 7, 2021, Motion originally pointed to the Beltons' literal account transcripts to show he satisfied the conditions of clause (ii).[21]  Specifically, the Commissioner argued that the descriptor "First Levy Issued on Module" proved that the core condition of clause (ii) was met—i.e., that the Commissioner had actually made a levy with respect to the liabilities underlying the section 7345 certifications.[22]

To further support his position, the Commissioner supplemented his Motion and provided TXMODA transcripts for the Beltons' 2010, 2014, and 2015 taxable years.  The Commissioner draws our attention to two action codes—action codes "600" and "640"—that appear on those transcripts.

The IRM explains that action code 600 is displayed on modules for tax accounts that are included in the State Income Tax Levy Program, or "SITLP."  IRM 5.19.9.2.1(4) (Oct. 20, 2016).  The SITLP is an automated levy program under which the proceeds of a taxpayer's state income tax refund can be applied to a federal tax liability.  (Not all states participate in SITLP, but Louisiana does.)   The IRM also indicates that action code 600 will only appear when "the levy has been served."  *Id.*  We take this to mean that action code 600 is generated

---

[21] The descriptors accompanying transaction code 971 on the Beltons' literal account transcripts state: "Collection due process Notice of Intent to Levy—Issued"; "Collection due process Notice of Intent to Levy—return receipt signed"; "First Levy Issued on Module"; "Account match for federal levy payment program"; "Collection due process levy (hearing) request or levy and lien (hearing) request received"; "Collection due process equivalent (hearing) request received"; "Collection due process (hearing) resolved by Appeals—Notice of Determination letter issued, you waived judicial review or withdrew the hearing request"; and "Collection due process equivalent (hearing) resolved by Appeals—decision letter issued or you withdrew the hearing request."

[22] "A Tax Module is a record of tax data for a specific taxpayer covering only one tax period."  IRM 4.71.2.2(4) (Oct. 29, 2019).  The tax modules for each taxpayer are maintained in a "Master File" that IRS employees can access through IDRS.  IRM 4.71.2.2(1)–(3); *see also Hawkins v. Commissioner*, T.C. Memo. 2008-168, 2008 WL 2736247, at \*1 n.4 (referring to the "Individual Master File Tax Modules reflecting petitioner's account in the [IRS]'s computer system").

[*22] when the state is notified that the Commissioner wishes to levy upon a taxpayer's state income tax refund.

Action code 640 is explained in IRM 5.19.1.5.19.5(1) and (2) (Dec. 26, 2017). The IRM states that "[Transaction code] 971 [action code] 640, has been created to identify tax periods for which levy action has occurred. . . . This transaction code will be systemically uploaded, beginning January 2017, the first time a module has been included on levy actions occurring after this date." *Id.*

In the Commissioner's view, the TXMODA transcripts, and in particular action codes 600 and 640, are sufficient to establish that the requirements of clause (ii) have been satisfied for 2010, 2014, and 2015.

iii. *Analysis*

We begin by noting that the descriptor included in the Beltons' literal account transcripts—"First Levy Issued on Module"—does not have enough specificity to tell us what the Commissioner actually did and how he met the statutory requirements. That descriptor by itself does not prove compliance with section 7345(b)(1)(C)(ii).

Turning next to the TXMODA transcripts, and bearing the presumption of regularity in mind, we agree that, absent any allegations or evidence that the levies were improper, action codes 600 and 640 would usually suffice to show that the Commissioner properly levied upon the taxpayers' right to receive any state income tax refund by providing notice to the appropriate state official.

After reviewing the Beltons' TXMODA transcripts for 2010 and 2014, we conclude that the Commissioner has shown that he met the requirements of section 7345(b)(1)(C)(ii) for those years by sending notice to the appropriate official for the State of Louisiana levying on the Beltons' right to receive any state income tax refund. The Beltons do not appear to dispute this conclusion.

But for 2015 the Beltons' TXMODA transcript and literal account transcript contain entries that raise questions about the validity of the Commissioner's levy. And the Commissioner has offered no account of those entries, as described further below.

Turning to the Commissioner's evidence for 2015, we note that the "First Levy Issued on Module" descriptor on the literal account transcript is dated June 12, 2017, which corresponds with the date for

**[*23]** action code 640 on the TXMODA transcript. Action code 600 on the TXMODA transcript is dated April 10, 2017.

The Beltons' account transcripts for 2015 indicate that the Beltons were pursuing collection alternatives around the same time the levy was made. A literal account transcript entry on March 21, 2017, states that there was a "[p]ending installment agreement." In what seems to be a contradiction, a second entry suggests that the installment agreement was "removed" the same day, while a third suggests that it was "removed" a month later, on April 18, 2017. Also on April 18, 2017, the IRS seems to have "[r]eceived [an] offer in compromise" from the Beltons, which it ultimately "denied" on March 15, 2018.[23]

As we have said, section 7345(b)(1)(C)(ii) requires that "a levy [be] made pursuant to section 6331." Section 6331 in turn sets out requirements that a levy must satisfy. As relevant here, section 6331(k) provides that no levy may be made (1) during the period that an offer-in-compromise or an offer for an installment agreement is pending, (2) during the period in which an installment agreement is in effect, or (3) during the 30 days following the rejection of an offer-in-compromise or an offer for an installment agreement. I.R.C. § 6331(k)(1) and (2).

There may very well be an explanation for the entries on the Beltons' 2015 account transcripts that is consistent with section 6331. But the Commissioner has not undertaken to provide it. For example, the Commissioner has not explained whether an installment agreement or an offer for an installment agreement was pending as of the levy date, or whether the levy was made during the 30 days following the rejection of an offer for an installment agreement. The Commissioner also has not explained the significance of the Beltons' April 18, 2017, offer-in-compromise request in light of action code 600 (dated April 10, 2017) and action code 640 (dated June 12, 2017). The obligation to provide such explanations rests with the party seeking summary judgment. *See Rowen*, 156 T.C. at 115–16 (collecting authorities); *see also* Rule 121(d); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly . . . ." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st

---

[23] Matching entries appear on the literal account transcripts for all of the relevant years, suggesting that the Beltons sought collection alternatives with respect to all their outstanding liabilities. And the literal account transcripts for 2006 reflect that the Beltons made payments totaling approximately $6,500 dollars on April 17, 2017. It is unclear from the transcript whether the payments were associated with a collection alternative.

**[\*24]** Cir. 1990))). We are therefore unable to conclude at present that the Commissioner made levy "pursuant to section 6331" for taxable year 2015. *See* I.R.C. § 7345(b)(1)(C)(ii).

6.     *Summary*

A table summarizing the components of the Beltons' seriously delinquent tax debt and the Commissioner's collection efforts at the time he made the section 7345 certifications follows.

| [*25] Year | Mr. Belton's Seriously Delinquent Tax Debt | Ms. Belton's Seriously Delinquent Tax Debt | Notice of Federal Tax Lien Filed or Levy Properly Made?[24] |
|---|---|---|---|
| 2004 | $7,795 | $7,795 | Notice of lien |
| 2005[25] | 10,444 | 10,444 | Notice of lien |
| 2006[26] | 7,424 | 7,424 | Notice of lien |
| 2007[26] | 7,358 | 7,358 | Notice of lien |
| 2008 | 4,611 | 4,611 | Notice of lien |
| 2009 | 3,043 | 3,043 | Notice of lien |
| 2010 | 3,346 | 3,346 | Levy |
| 2012[27] | 2,223 | — | Notice of lien |
| 2014 | 2,556 | 2,556 | Levy |
| 2015[28] | Unconfirmed | Unconfirmed | Unconfirmed |
| **Total** | **$48,800** | **$46,577** | |

For the taxable years 2004, 2005, 2006, 2007, 2008, 2009, and 2012, the Commissioner issued notices of federal tax liens in accordance with section 6323. For the taxable years 2010 and 2014, the Commissioner levied pursuant to section 6331 on the Beltons' right to

[24] As discussed above, for years where a notice of tax lien was filed we need not determine whether levy was properly made.

[25] Because they did not timely file their 2005 tax return, the Commissioner prepared a separate substitute for return for the each of the Beltons for that year. Based on the substitute return initially prepared for Ms. Belton, Ms. Belton's Notice of Certification includes an additional $2,891 unpaid tax liability for the taxable year 2005, not shown here. Upon acceptance of a joint return filed by the Beltons, this additional liability was abated but erroneously included in Ms. Belton's Notice of Certification. This error would have been harmless if the Commissioner had shown that levy was properly made for 2015 because Ms. Belton's unpaid tax liabilities, not including the additional 2005 liability, would still exceed the threshold in section 7345(b)(1)(B) and (f).

[26] As discussed above, shortly after the Commissioner made the section 7345 certifications, the unpaid account balances for the taxable years 2006 and 2007 were written off because the periods of limitations on collection for those years had expired. But we evaluate the certifications without regard to the writeoff. *See supra* note 17.

[27] *See supra* note 6.

[28] The Commissioner has not yet demonstrated how the $17,979 shown on the Beltons' Notices of Certification for 2015 qualifies as seriously delinquent tax debt.

**[\*26]** receive their state income tax refunds. But the Commissioner has not yet shown that he made levy "pursuant to section 6331" for the taxable year 2015, and thus we cannot include the outstanding liability for that year in the calculations to determine compliance with section 7345(b)(1)(B) and (f). Therefore, the Commissioner has not yet shown that, when he made the section 7345 certifications, the Beltons had seriously delinquent tax debt of more than $52,000 for the relevant years.

To summarize, we find that, on the basis of the arguments made by the Commissioner in his Motion, as supplemented, and the record he has submitted so far, summary judgment is not appropriate as to the issue of whether the section 7345 certifications were properly made. We note in closing that our holding today does not preclude the Commissioner from filing another motion for summary judgment to demonstrate, through the record currently before the Court or through the introduction of other evidence, that levy was properly made with respect to the taxable year 2015, either under the SITLP process or some other levy procedure. But, given the important consequences that may follow from the Commissioner's certification that an individual has a seriously delinquent tax debt—namely, the potential revocation (or denial) of a passport and the concomitant loss of the ability to travel outside the country—it is important for this Court to ensure that the Commissioner has strictly complied with the conditions Congress established in the statute.

III.   *Conclusion*

In light of the discussion above, we will grant the Commissioner's Motion as supplemented insofar as it relates to the issue of our jurisdiction to review the liability underlying the section 7345 certifications, deny the Commissioner's Motion as supplemented insofar as it relates to whether the section 7345 certifications were properly made, without prejudice to renew the same, and deny the Beltons' Motion.

To reflect the foregoing,

*An appropriate order will be issued.*